**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 13-27091 |
| West Side Community Hospital Inc., | ) | |
|     Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 13-27093 |
| Superior Home Health, L.L.C., | ) | |
|     Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 13-27092 |
| Garfield Kidney Center, LLC, | ) | |
|     Debtor. | ) | |

**DECLARTION OF PAUL RUNDELL IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Paul Rundell, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.  I am the chief restructuring officer ("CRO") of West Side Community Hospital, Inc., d/b/a Sacred Heart Hospital ("Sacred Heart"), Superior Home Health, L.L.C. ("Superior"), and Garfield Kidney Center, LLC ("Garfield," and collectively with Sacred Heart and Superior, the "Debtors").

2.  I am also a Managing Director of Alvarez & Marsal's Healthcare Industry Group LLC (A&M) in Chicago, Illinois. I have more than sixteen (16) years of experience, specializing in debtor advisory and interim management services, with a focus on restructuring, cash management and financial analysis for healthcare organizations. I have provided cash management, financial support, crisis management, turnaround consulting, business strategy and planning, market analysis, and operational improvement services to borrower clients. I have advised debtors, unsecured and secured creditors both in and out of court.

{9111 DEC A0349212.DOC 9}

3. I am a Certified Insolvency Restructuring Advisor ("CIRA") and Certified Turnaround Professional ("CTP").

4. In my capacity as CRO, I have personal knowledge of and am familiar with the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this Declaration on behalf of the Debtors.

## INTRODUCTION

5. On July 2, 2013 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Northern District of Illinois, Eastern Division, thereby commencing the above-entitled cases (the "Cases").

6. The Debtors remain in possession of their assets and continue to operate their businesses as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

7. No trustee, examiner, or committee has been appointed in this case.

8. As described more fully in Section III below, the Debtors have contemporaneously filed the following motions and applications (collectively, the "First Day Motions"):

   a. Debtors' Emergency Motion for an Order (I) Directing Joint Administration of Cases and (II) Approving Caption for Jointly Administered Cases Pursuant to 11 U.S.C. § 342 and Fed. R. Bankr. P. 1005, 1015(B) and 2002 (the "Joint Administration Motion");

   b. Debtors' Emergency Motion For Postpetition Financing and Related Relief ("Pospetition Financing Motion");

   c. Motion for Order Pursuant to 11 U.S.C. §§ 507 and 363(A) Authorizing, but not Directing, Payment of Prepetition Priority Wages, Salaries and Employee Benefits and Continuation of Employee Benefit Plans and Programs Postpetition, (B) Authorizing, but not Directing, Deductions from Employees' Paychecks, and (C) Directing All Banks to Honor Prepetition

        Checks for Payment of Prepetition Employee Obligations (the "Wage Motion");

    d. Debtors' Emergency Motion for Authority to (A) Maintain Existing Bank Accounts, (B) Continue Use of Existing Cash Management System, (3) Continue Use of Existing Business Forms and (4) Waive Investment and Deposit Requirements (the "Cash Management Motion").

9. I am submitting this Declaration in support of the Debtors' First Day Motions. Capitalized terms not defined in this Declaration shall have the meanings ascribed to the terms in the relevant First Day Motions. Except as otherwise indicated, I have personal knowledge of the matters set forth in this Declaration based on my review of relevant documents, and my opinions are based upon my experience and knowledge of the Debtors' operations and financial condition, as well as information provided to me by management, advisors, or other representatives of the Debtors. If I were called upon to testify, I would testify consistently with the facts set forth in this Declaration.

10. This Declaration is divided into three sections. Section I provides an overview of the Debtors and their operations. Section II explains the circumstances that led to the filing of the Debtors' Cases. Section III affirms and incorporates facts that support the Debtors' First Day Motions.

## I.    OVERVIEW OF THE DEBTORS' BUSINESSES

11. Sacred Heart is a 119-bed acute care hospital located at 3240 West Franklin Boulevard, Chicago, Illinois that also owns and operates medical clinics in the Garfield Park neighborhood of Chicago, Illinois. Prior to the events leading up to the filing of these Cases, Sacred Heart had annual revenues in excess of $40 million and net income of approximately $10 million.

12. Garfield, an Illinois limited liability company, is affiliated with Sacred Heart and operates a kidney dialysis facility on a property adjacent to Sacred Heart. Garfield currently has annual revenues of approximately $3.2 million and currently employs approximately 18 employees.

13. Superior is also an Illinois limited liability company. Superior provides home health care services within Cook County, DuPage County and Will County, Illinois out of a facility at 4054 W. North Ave., 2nd Floor, Chicago, Illinois. Immediately prior to the Petition Date, Superior terminated all of its 20 employees and ceased operations.

14. Edward Novak is the sole shareholder of Sacred Heart, and is also the sole shareholder of West Side Management Corporation ("WSMC"). WSMC, in turn, is the sole the sole member of Superior Home Health, L.L.C. and Garfield Kidney Center, LLC.

## II.   EVENTS LEADING TO THE BANKRUPTCY

### A.   Criminal Indictment

15. On April 16, 2013, the chief executive officer ("CEO") and chief financial officer ("CFO") of Sacred Heart—Mr. Novak and Roy Payawal, respectively—and several physicians at Sacred Heart were indicted for Medicare fraud in the U.S. District Court for the Northern District of Illinois. The indictment includes allegations that certain doctors had performed unnecessary surgeries and that Messrs. Novak and Payawal had created a referral kickback scheme for doctors. The Debtors were not charged with any wrongdoing by the federal authorities and continued to operate after the indictments.

16. On April 16, 2013, federal authorities seized $1,924,381, an amount sufficient to cover the potential liability resulting from the alleged fraud. Federal authorities also seized certain financial and operational files and documents.

17. On April 26, 2013, Mr. Novak retained A&M to oversee operations for the Debtors and ceded all operational control to the CRO and A&M. Mr. Novack also appointed an independent board of directors, comprised of three physicians that have no involvement with any alleged wrongdoing, to manage the Debtors. The prior executive management involved with the alleged fraud has been removed.

**B.     Setoff by FirstMerit**

18. In addition to owning the Debtors, Mr. Novak owns Bentley Management ("Bentley"), which in turn owns two medical malpractice reinsurance funds. It is my understanding from speaking to the affiliated insurance broker that the doctors insured by these funds are not otherwise affiliated with the Debtors.

19. FirstMerit issued a $5 million letter of credit ("LOC") on behalf of Bentley, which was purportedly secured by the assets of the Debtors.

20. On April 17, 2013, FirstMerit asserted its purported right of setoff and withdrew the amount of $2,010,950 from the Debtors' accounts in order to further secure the LOC.

21. Between the federal authorities' seizure and FirstMerit's setoff against Sacred Heart's deposit accounts, roughly $4 million in cash was depleted from Sacred Heart, Garfield and Superior (the Debtors), leaving barely enough cash funds for the hospital to operate.

**C.     Patient Census Decline and Withholding of Medicare Funds**

22. Prior to the indictment, the average daily census at Sacred Heart was approximately 40 patients per day. Shortly after the indictment, Sacred Heart experienced more than a fifty percent (50%) decline in the average daily census.

23. In addition, on May 14, 2013, Centers for Medicare and Medicaid Services ("CMS") began to withhold Medicare payments, without notification, due to suspicion of fraud. As of the Petition Date, the amount withheld by CMS is in excess of $1.3 million.

24. On May 21, 2013, Sacred Heart received a notice from CMS formally withholding all further Medicare payments. On May 22, 2013, Sacred Heart sent a rebuttal to CMS urging it to resume payments and warning that, without Medicare funding, the hospital would have to shut down. CMS responded that it would continue to withhold payments for 180 days.

25. As a result of CMS' refusal to resume Medicare payments, Sacred Heart had insufficient cash to fund payroll and was unable to continue operations.

26. On July 1, 2013, Sacred Heart properly transitioned all of its patients to other healthcare facilities in the area.

27. As of July 2, 2013, Sacred Heart and Superior suspended all patient care and terminated approximately 200 of their 270 employees.

**D. Sale Efforts**

28. In early May, 2013, A&M began to reach out to twenty-five (25) potential buyers for an expedited sale of the Debtors' assets.

29. With respect to Sacred Heart, four (4) parties signed nondisclosure agreements. As of the Petition Date, Sacred Heart is negotiating with a few potential purchasers for amounts above the liquidation price of its assets.

30. With respect to Garfield, ten (10) parties executed nondisclosure agreements, and three (3) parties signed letters of intent. The largest purchase price is in the amount of $5.5

million. Garfield anticipates filing a motion seeking approval of bid procedures in connection with an auction of its assets within two (2) weeks of the Petition Date.

### III.  FACTS IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS

31. I believe that the relief sought in all of the First Day Motions is vital to preserving the value of the hospital at Sacred Heart and Superior's home health care business and maintaining the business operations and value of Garfield's dialysis business.[1]

#### A.  The Wage Motion.

32. By the Wage Motion, the Debtors request (a) authority to pay or otherwise honor their respective employee-related prepetition priority obligations to, or for the benefit of, current employees and those employees terminated as of July 1, 2013, and to continue postpetition the employee benefit plans and programs and programs in effect immediately prior to the filing of the Cases for employees that were not terminated as of the Petition Date; (b) authority to make certain tax and related deductions from employees' paychecks; and (c) an order directing all banks to honor prepetition checks for payment of the Debtors' prepetition employee obligations.

33. The Debtors require this relief to maximize the value of their bankruptcy estates. Specifically, the Debtors believe that there is a significant risk that Employees who have not been terminated and whose Prepetition Employee Obligations are not honored in the ordinary course of business will terminate their employment relationships with the Debtors. The continued service and dedication of the Employees is critical to the Debtors and their prospects for consummating successful sales of the assets of Sacred Heart and Garfield. In order to retain their Employees, maintain morale under difficult working conditions and avoid jeopardizing the

---

[1] Capitalized, undefined terms in Section III shall have the meanings set forth in the respective First Day Motions.

basic operation of their business pending the sale of their assets, the Debtors must have authority to pay or otherwise satisfy all Prepetition Employee Obligations.

34. Although many of the Sacred Heart Employees and all of the Superior Employees were terminated one day prior to the Petition Date, the Debtors submit that their cooperation remains critical to maximizing the value of the Debtors' assets. As stated above, Sacred Heart anticipates selling its assets as a going concern pursuant to § 363 of the Bankruptcy Code in a private sale within 2 weeks of the Petition Date, and is currently negotiating with potential purchasers. It is likely that Sacred Heart will request certain of the terminated employees to assist in these efforts. Paying the Prepetition Employee Obligations is critical to ensuring this cooperation. Further, maintaining the morale of terminated employees is important for maximizing the value of the Debtors' assets, because any purchaser of the assets of Sacred Heart will likely wish to re-hire these terminated Employees.

35. Finally, and most importantly, paying the current and terminated Employees will not prejudice general unsecured creditors. The Employees are priority unsecured creditors under 11 U.S.C. § 507(a)(4) and, regardless of whether the Wage Motion is granted, are entitled to priority over general unsecured creditors. The relief requested by the Wage Motion merely trades a claim by priority unsecured creditors with an administrative claim by the Lender. Thus, the relief requested by the Wage Motion will not prejudice general unsecured creditors.

36. In any event, the Debtors believe that it is likely that all unsecured creditors will eventually be paid in full from the proceeds of the sales of Sacred Heart and Garfield. Therefore, paying these terminated Employees is in the best interest of the Debtors' estates.

### B. The Joint Administration Motion.

37. By the Joint Administration Motion, the Debtors request an order (i) authorizing the joint administration of the Cases for procedural purposes only and (ii) approving a caption for the Cases.

38. WSMC is the sole shareholder of each of the Debtors. Thus, the Debtors are all "affiliates" within the meaning of section 101(2) of the Bankruptcy Code and joint administration of their estates is appropriate under Bankruptcy Rule 1015(b).

39. Joint administration of the Cases will facilitate administrative tasks in the Cases and avoid unnecessary expense. The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings and orders in these cases will affect each of the Debtors. The failure to jointly administer these Cases would result in numerous duplicative pleadings filed for each issue and served upon separate service lists. Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Clerk of the Court with voluminous filings.

40. In addition, joint administration will permit the Clerk of the Court to utilize a single general docket for the Cases and permit counsel for all parties in interest to include the Debtors' respective estates in a single caption on the documents served and filed in these Cases, thus enabling parties in interest in each of the Cases to be apprised of the various matters before the Court.

### C. The Cash Management Motion.

41. By the Cash Management Motion, the Debtors request that the Court authorize (i) the continued use of the Debtors' existing business forms and records, and (ii) the maintenance of the Debtors' existing bank accounts and cash management system.

42. The Office of the United States Trustee has established certain operating guidelines for debtors in possession governing their bank accounts and cash management systems. The guidelines are set forth in detail in the Cash Management Motion.

43. In these Cases, the Debtors' Bank Accounts are linked through their shared accounting software and comprise a centralized cash management system that the Debtors designed to collect, transfer, and disburse funds and to record accurately such collections, transfers and disbursements. All of the Bank Accounts are at FirstMerit. Specifically, Sacred Heart maintains three (3) Bank Accounts, including an operating account, payroll account, and a general account; Garfield maintains one (1) general operating account; and Superior maintains one (1) general operating account.

44. The Debtors request permission to maintain the Bank Accounts notwithstanding the United States Trustee's requirement that existing bank accounts be closed and new postpetition bank accounts be opened. Further, the Debtors request that the Bank Accounts be deemed debtor in possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period, be authorized.

45. The Debtors also request authority to continue to use their existing cash management system as it may be modified as required by the Debtors in Possession in the exercise of their respective business judgment. The Debtors' cash management system allows the Debtors to manage all of their cash flow needs and includes the necessary account mechanisms to enable the Debtors to trace funds, ensure that all transactions are adequately documented and readily ascertainable, and comply with applicable requirements. The Debtors

will continue to maintain detailed records reflecting all transfers of funds, such as the transfer of funds for payroll reimbursements.

46. Enforcement of the United States Trustee's requirements would be expensive, create unnecessary administrative problems, and impair the Debtors' efforts to preserve the going concern value of their estates. Accordingly, the Debtors request that Court allow them to preserve their current Bank Accounts and Cash Management System.

### D.    The Postpetition Financing Motion.

47. By the Postpetition Financing Motion, the Debtors seek the entry of interim and final orders approving Postpetition Financing in the amount of $410,000 from BCL-M&E LLC ("Lender"). Of that amount, $400,000 will be used by the Debtors for operating capital, and $10,000 will be used to pay the Lender's closing fees, expenses, and attorneys' fees. An interest fee of $75,000 for the first three months shall be charged to the Debtor for the Postpetition Debt, and $30,000 per month for each month thereafter that the Postpetition Debt remains outstanding. Default interest fee shall be in the amount of $50,000 for each 30 day period following an Event of Default. All interest fees are deemed earned as of the first day of each interest period.

48. The Debtors require the Postpetition Financing to pay expenses incurred in the ordinary course of their businesses associated with the maintenance and preservation of the Debtors' assets. These expenses include, without limitation, payroll, employee related expenses, maintenance costs, security, taxes, and insurance. The Lender has conditioned its extension of the Postpetiton Financing upon the entry of interim and final orders granting Lender (i) superpriority administrative expense status under § 364(c)(1), with priority over all costs and expenses of administration of the Cases incurred under §§ 503(b) and 507(b), (ii) valid and perfected liens on all Postpetition Collateral pursuant to § 364(c)(2), (iii) valid and perfected

senior liens on all of the Postpetition Collateral pursuant to § 364(d); and (iv) mortgages on the Non-Debtor Real Estate. The fulfillment of these and other material conditions to the Postpetiton Financing are reflected in the proposed Financing Order and the Postpetition Documents.

49. As a result of (i) the federal authorities' seizure of $1.9 million and FirstMerit's set off in the amount of $1.3 million against Sacred Heart's deposit accounts and (ii) CMS' withholding of over $1.3 million in legitimate Medicare receivables, the Debtors temporarily have insufficient cash on hand to pay all immediate obligations as they become due. Absent entry of the Financing Order to provide funding for the budgeted expenses, the Debtors will be unable to pay for the outstanding priority wages for current and former employees and will be unable to preserve the value of their assets, resulting in immediate and irreparable harm to the estate.

50. The Debtors believe that the terms of the Postpetition Financing, taken as a whole, are more favorable to the Debtors than those available from alternative sources. Moreover, the Debtors are not aware of any alternative sources given the Debtors' current financial condition. Indeed, I and A&M have contacted over a dozen potential finance lenders in the distressed healthcare lending market and approximately 6 strategic buyers to provide funding for Sacred Heart pending a potential sale of the Debtors on a going-concern basis. None of those potential lenders were interested in providing the Postpetition Financing on a secured or unsecured basis at any interest rate.

51. The terms of the Postpetition Financing have been negotiated in good faith and at arm's length between the Debtors and the Lender and are fair and reasonable under the circumstances. The Lender has indicated that it will not provide funding to the Debtors unless

that funding is secured by a senior lien on the Postpetition Collateral and the Non-Debtor Real Estate.  Because (i) the Debtors intend to use that funding for maintaining and preserving the value of the Postpetition Collateral pending the sale of the Debtors' businesses as going-concerns, (ii) the Debtors have been unsuccessful in obtaining a secured lending commitment from commercial lenders other than Lender, and (iii) the Debtors believe that the existing value of the Postpetition Collateral is more than sufficient to support the aggregate value of any existing non-Lender liens as well as the anticipated amount of the Postpetition Financing, the grant of a senior lien to Lender on the Postpetition Collateral is appropriate under the circumstances and will permit the adequate protection of any prior liens that may be primed as a result of the senior lien to Lender.

*[signature page follows]*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 2, 2013

_____
Paul Rundell